| | | |
|---|---|---|
| HAMIMI YATA and | ) | |
| JASMIN ZUKANCIC, individually and | ) | |
| on behalf of others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 17-cv-03503 |
| v. | ) | |
| | ) | Judge Sharon Johnson Coleman |
| BDJ TRUCKING CO. and SENAD | ) | |
| MUJKIC, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This case arises out of defendants' equipment leases with plaintiffs. Before the Court are cross-motions for summary judgment. For the reasons set forth below, plaintiffs' motion for summary judgment [92] is granted in part and denied in part and defendants' motion for summary judgment [95] is denied.[1]

## I.      Background

The following facts are undisputed unless otherwise noted. BDJ Trucking Co., Inc. ("BDJ") is a transportation carrier that employs and contracts with drivers to transport its customers' freight throughout the United States. BDJ is an Illinois corporation headquartered in Niles, Illinois. Senad Mujkic is the owner and CEO of BDJ (together with BDJ, "Defendants"). Named plaintiffs Hamimi Yata ("Yata") and Jasmin Zukancic ("Zukancic") are owner-operator drivers that worked for BDJ at various points between 2013 and 2016. For purposes of the Truth in Leasing Act

---

[1] In their summary judgment motion, defendants also move to decertify the class. Defendants' motion to decertify is cursory and fails to argue the correct standard. The Court declines to decertify.

("TLA") claims, Yata and Zukancic represent a class of individuals and entities that signed

equipment leases with BDJ between April 1, 2013 and April 1, 2017 ("Plaintiffs").

Between 2013 and 2017, BDJ employed over 50 owner-operator semi-truck drivers. All the

drivers signed an equipment lease that governed various aspects of their employment, including

terms of their compensation. BDJ primarily used two versions of the equipment lease between 2013

and 2017. BDJ asked all drivers to sign version one (the "Lease Agreement") between April 2013

and April 2017. The Lease Agreement is a one-page provision that plaintiffs leased their semi-trucks

to BDJ pursuant to the TLA. The Lease Agreement does not set out terms of driver compensation

nor does it authorize BDJ to make deductions from driver pay. BDJ also asked drivers to sign a

second version of the equipment lease (the "Service Agreement") between October 2014 and April

2017. The Service Agreement is a multi-page document that includes provisions pertaining to driver

pay, insurance requirements, indemnification, termination, confidentiality, among other matters.

The Service Agreement specified that if drivers chose to purchase occupational insurance, they will

be required to pay the monthly premium. No other deduction related to occupational insurance is

specified in the Service Agreement.

BDJ's deductions form the basis of this lawsuit. First, BDJ paid its insurance broker $141

per month per driver for occupational insurance, but charged drivers $186 per month for the

insurance. Second, BDJ failed to fully reimburse drivers for escrow deductions. For example, BDJ

deducted $5,100 in escrow from Yata's paychecks, but only repaid him $3,605. BDJ did not pay

interest on the escrow amounts. Third, BDJ deducted a $90 "one-time processing fee" from most

drivers' paychecks, which was not mentioned in the Service Agreement nor the Lease Agreement.

Fourth, BDJ paid drivers less than the rate per mile listed in their agreements. BDJ disputes

whether the written contract governs. Plaintiffs allege that unauthorized deductions on escrow

deposits, BDJ's failure to pay interest on escrow deposits, overcharges on occupational accident

insurance, unauthorized deductions for a one-time processing fee, and underpayment of wages are each violations of the TLA and the Illinois Wage Payment Collection Act ("IWPCA").

## II.    Legal Standard

Summary judgment is proper when "the admissible evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *McGreal v. Vill. of Orland Park*, 850 F.3d 308, 312 (7th Cir. 2017), *reh'g denied* (Mar. 27, 2017) (quoting *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014)); *see also* Fed. R. Civ. P. 56(a). In deciding whether summary judgment is appropriate, this Court accepts the nonmoving party's evidence as true and draws all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 244, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986). The Court may enter summary judgment only if the record as a whole establishes that no reasonable jury could find for the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.,* 209 F.3d 687, 692 (7th Cir. 2000).

## III.    Analysis

Plaintiffs move for summary judgment on their TLA claims and the named plaintiffs move for summary judgment on their individual IWPCA claims. Defendants move for summary judgment on the TLA and IWPCA claims.

### A.   Statute of Limitations

The Court first addresses defendants' threshold argument that plaintiffs' claims are barred by the statute of limitations. The parties agree that a four-year statute of limitations period applies under the TLA. Defendants argue that accrual begins when the plaintiffs signed the Service and Lease Agreements, noting that Yata signed his agreement on April 4, 2013. Plaintiffs argue that accrual begins when plaintiffs discovered the injury and that regardless, the TLA claims relate back to the October 2016 filing of the first amended complaint. While the Court appreciates defendants' statement that "defendants will allow this Court to review the existing arguments presented by the

3

parties," the Court agrees with plaintiffs. (Dkt. 114, Defendants' Reply, pg. 9.) Under Federal Rule of Civil Procedure 15(c)(B), an amendment to a pleading relates back to the date of the original pleading when the amendment asserts a claim or defense that arose out of the conduct described in the original pleading. Here, plaintiffs' TLA claims arise out of the same conduct alleged in the October 2016 complaint; unauthorized deductions and underpayment. The class only includes individuals that signed leases beginning in 2013, so plaintiffs' claims are not barred by the statute of limitations.

## B. TLA Claims

The TLA requires equipment leases from motor carriers to drivers to include the amount to be paid for the drivers' services, the cost of equipment insurance to be deducted from drivers' pay, the escrow amount to be deducted from drivers' pay, and a statement that the motor carrier will pay interest on the escrow amount while in possession of the escrow account. *See* 49 C.F.R. § 376.12. Plaintiffs claim that BDJ violated the TLA by:

1. Deducting escrow amounts that were not authorized by the Lease Agreement or Service Agreement and not reimbursing the entire escrow amounts

2. Neglecting to pay interest on the escrow deposits

3. Deducting processing fees that were not authorized by the agreements

4. Overcharging drivers for insurance

5. Under-paying drivers

BDJ argues that the court should apply a substantial compliance standard when evaluating whether a lease agreement complies with the TLA, claiming that TLA regulations are consistently reviewed for substantial compliance. Plaintiffs dispute this standard, noting that several courts have rejected the substantial compliance standard in favor of a strict compliance standard. There is no uniform standard that courts apply in evaluating TLA violations. Some courts use a substantial

compliance standard (*see, e.g., Owner-Operator Independent Drivers Association, Inc. v. Ledar Transport*, No. 00-0258-CV-W-FJG, 2004 WL 5376211 (W.D. Mo. 2004)), while others use a strict or "literal" compliance standard (*see, e.g.*, *Port Drivers Federation 18, Inc. v. All Saints Exp., Inc.*, 757 F. Supp. 2d 443 (D.N.J. 2010); *Cunningham v. Lund Trucking Co.*, 662 F. Supp. 2d 1262 (D. Or. 2009); *Owner-Operator Indep. Drivers Assoc., Inc. v. C.R. England, Inc.* 508 F. Supp. 2d 972, 975 (D. Utah 2007)). This district has not expressed a preference for either standard.

The Court is persuaded by the reasoning of the courts espousing a strict compliance standard. As plaintiffs note, a Florida district court rejected the substantial compliance standard because the text of the TLA repeatedly uses the word "shall" ("leases 'shall contain' certain provisions and that motor carriers 'shall' adhere to…the lease"), indicating an obligation "impervious to judicial discretion." *Owner-Operator Indep. Drivers Ass'n, Inc. v. Landstar Inway, Inc.*, No. 3:02CV1005 J25HTS, 2006 WL 4069044, at *4 (M.D. Fla. Oct. 6, 2006) (citing *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Learch*, 523 U.S. 26, 35, 118 S. Ct. 956 (1998)). The Court agrees that the repeated use of the word "shall" suggests the necessity of full compliance with the statute and adopts the strict compliance standard. The Court next evaluates each alleged TLA violation: paying drivers a lower rate per mile than in the contract, deducting escrow amounts that were not fully reimbursed, deducting processing fees, and overcharging drivers for occupational insurance.

*Rate Per Mile*

BDJ admits to paying plaintiffs less than the rate per mile listed in their service agreements, but states that they notified drivers of the lower wage. For example, BDJ states that Yata was originally paid the contractual rate of $1.70 per mile, but paid the new rate of $1.50 per mile after BDJ notified all drivers in August 2015 of a rate reduction. BDJ changed the rates two more times through letters notifying the drivers. Employers cannot unilaterally modify contracts to pay workers a lower wage. *See Jack Thompson Oldsmobile, Inc. v. N.L.R.B*, 684 F.2d 458, 461 (7th Cir. 1982).

Accordingly, the letters are insufficient to modify the Service Agreement. The Court is more concerned with BDJ's claim that plaintiffs agreed to the rate change and whether the oral agreement is enforceable. One of the plaintiffs clearly admits to agreeing to the rate reduction. (Dkt. 110-6, Affidavit of Hatem Bitar, pg. 5). Without citing caselaw, plaintiff argues that any oral agreements and letters are not permitted under the TLA and that the TLA requires new leases with new terms. In the section of the TLA plaintiffs cites, there is no mention of oral agreements or modifications of existing leases. However, a separate section of the TLA specifically requires a written lease. 49 C.F.R. § 376.11. At least one judge in this district has rejected oral leases. *Bonkowski v. Z Transp., Inc.*, No. 00 C 5396, 2004 WL 524723, at *3 (N.D. Ill. Mar. 5, 2004) (Coar, J.). Since any oral agreements to modify the leases are unenforceable, the written agreements are operative. The Service Agreement clearly provides a specified rate per mile. Under the strict compliance standard, BDJ's failure to pay the contractual rate per mile entitles plaintiffs to summary judgment on this issue.

*Escrow*

Plaintiffs argue that neither the Lease Agreement nor the Service Agreement authorized escrow deductions. Plaintiffs also note that defendants admitted to making escrow deductions and that the lease agreements do not lay out the specific deductions. The TLA requires that agreements describe "specific items to which the escrow fund can be applied" or "conditions the lessor must fulfill in order to have the escrow fund returned." 49 C.F.R. § 376.12(k)(2), (6). BDJ claims that the escrow amounts were for insurance deductibles, pointing to language in the Service Agreement stating "OWNER-OPERATOR must pay all fines and damages incurred, such as traffic violations, damage to loads, etc…Cargo and Liability insurance have a $1,500 deductible; OWNER-OPERATOR is responsible for first $1,500 in damages for each accident incurred." (Dkt. 111-1, Hamimi Yata Service Agreement, pg. 5.) But the Service Agreement does not specify that the

insurance deductible will be held in escrow prior to any accidents occurring. This failure to specify violates the TLA under the strict compliance standard. BDJ also fails to address plaintiffs' argument that it did not pay interest on the escrow deductions, so it has waived any opposition on that point. Plaintiffs are entitled to summary judgment on the escrow deductions.

*One-Time Processing Fees*

Defendants do not move for summary judgment on this issue, so the Court only evaluates plaintiffs' motion on the processing fees. Plaintiffs claim that BDJ charged drivers $90 each to process their employment applications. Plaintiffs argue that these fees were impermissible chargebacks in violation of 49 C.F.R. § 376.12(h). Plaintiffs' only factual support is a declaration by a paralegal calculating the total amount of processing fees assessed and BDJ's admission that it charged processing fees (without specifying what the processing fees were for). While this declaration is useful for calculating potential damages, it is not sufficient for summary judgment. Plaintiffs have not provided enough evidence for the Court to assess whether these fees were chargebacks. The Court denies summary judgment on the processing fees.

*Occupational Insurance*

Plaintiffs suggest that BDJ overcharged plaintiffs for occupational insurance, noting that defendants charged plaintiffs $186.33 per month while actually paying the insurance broker $141.73 per month. Defendant Mujkic admits that BDJ charged drivers more for insurance than it paid the broker. (Dkt. 94-4, Senad Mujkic Deposition Transcript, pg. 19-26.) BDJ even admits that the agreements did not allow BDJ to upcharge drivers. (*Id.* at 40.) BDJ argues that it orally informed plaintiffs of the actual amount of insurance that would be deducted and vaguely refers to agency fees, implying that the upcharge covered agency fees. This argument is first rejected for the reasons the Court discussed above concerning oral modifications to the lease. Second, the plain text of the Service Agreement reads that the "OWNER-OPERATOR will pay the monthly premiums for that

7

insurance" and makes no mention of agency fees. (Dkt. 94-5, Exhibit 2 to Berina Babic Deposition, pg. 12.) Given the strict compliance standard, charging agency fees or an upcharge of any type violates the language of the agreements. The Court grants plaintiffs' motion for summary judgment on the insurance upcharges.

### C. IWPCA Claims

The IWPCA prohibits employers from making deductions unless deductions are required by law, to the employee's benefit, in response to valid wage deduction order, or made with the express written consent of the employee. *See generally* 820 ILCS 115. Named plaintiffs argue that defendants violated the IWPCA by deducting occupational insurance, failing to reimburse escrow deductions, deducting one-time processing fees and underpaying workers. Defendants argue that plaintiffs are independent contractors and not covered by the IWPCA.

*Worker Classification*

The Court must first evaluate whether Yata and Zukancic are employees for purposes of the IWPCA. Individuals are independent contractors and, therefore, not covered by the IWPCA if they are (a) free from the control and direction over the performance of their work, both contractually and in reality; (b) perform work either outside the usual course of business or outside all of the places of business of the employer unless the employer is in the business of contracting with third parties for placement of employees; and (c) in an independently established trade, occupation, profession, or business. 820 ILCS 115/2. If an employer cannot meet each of the prongs, the individual is an employee. *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1050 (7th Cir. 2016).

The named plaintiffs argue they were not free from BDJ's control because BDJ required them to follow written work rules such as bringing their daily logs to BDJ, providing BDJ with copies of repairs and maintenance, following schedules for certain runs, and documenting all Department of Transportation inspections. (*See* Dkt. 94-15, Company Rules and Procedures, pg. 2-

8

5.) An employer has control if they have the "right to control and direct the worker, not only as to the work to be done, but also as to how it should be done, whether or not that control is exercised." *AFM Messenger Service, Inc. v. Dept. of Employment Sec.*, 315 Ill. App. 3d 308, 314 (1st Dist. 2000).

While *AFM* concerned the Unemployment Insurance Act, the test for determining whether an individual is an employee or independent contractor is substantially similar to the IWPCA's and is persuasive to this Court. Defendants argue that *AFM* is distinguishable because it concerns local drivers, but that distinction is irrelevant. In *AFM*, the Illinois Appellate Court determined that the employer had control because the employer, not the drivers, (1) provided the written contract; (2) determined delivery rates; and (3) kept records of drivers' commissions. Similarly, BDJ Trucking provided standard contracts to the drivers and determined their rates per mile. The written work rules plaintiff describe are further evidence of BDJ's control. Although BDJ may not have controlled how the drivers drove their trucks, they controlled a majority of plaintiffs' work. The named plaintiffs were not free from BDJ's control and direction over the performance of their work and do not meet one of the conditions for exclusion from IWPCA coverage. Accordingly, the named plaintiffs are employees specifically for the IWPCA claims.

*IWPCA Violations*

Since named plaintiffs qualify for IWPCA coverage, the Court next evaluates whether defendants violated the IWPCA. Defendants' motion for summary judgment on the IWPCA is solely based on the classification issue and not the substantive IWPCA claims, so the Court only evaluates plaintiffs' motion for summary judgment on the specific IWPCA violations. The IWPCA prohibits employers from taking deductions from employees' wages unless the deductions are "(1) required by law; (2) to the benefit of the employee; (3) in response to a valid wage assignment or wage deduction order; [or] (4) made with the express written consent of the employee, given freely at the time the deduction is made." 820 ILCS 115/9. Yata and Zukancic argue that the deductions

for occupational insurance, unreimbursed escrow, one-time processing fees, and fines were illegal deductions.

Defendants claim that the occupational insurance was for the employees' benefit and was thus a legal deduction under the IWPCA. Named plaintiffs argue that the insurance was not a benefit because the plaintiffs did not want to buy the insurance, the agreements did not disclose the amount of the deduction, and the agreements did not allow plaintiffs to withdraw authorization for the deduction. Yata and Zukancic have not offered evidence showing plaintiffs did not want the occupational insurance and a reasonable jury could conclude that insurance was a benefit to the employees. Further, the agreements disclosed that the employees would pay the monthly premiums for insurance. (Dkt. 94-5, Exhibit 2 to Berina Babic Deposition, pg. 12.) The agreements did not disclose the amount, but the disclosure of the deduction itself is sufficient to create an issue of material fact for trial. Plaintiffs claim that their written consent was not valid, but the Court is not persuaded without further evidence.

As to the unreimbursed escrow, defendants fail to argue why the escrow deductions did not violate the IWPCA. To the extent defendants intended to present the same argument for the IWPCA claims as the TLA claims on escrow deductions, the Court has already found those arguments unavailing as described above. There is no genuine issue of material fact on escrow deductions and the named plaintiffs are entitled to summary judgment on this issue.

Yata also argues that defendants violated the IWPCA by failing to pay him the contractual rate per mile. Yata notes that IWPCA requires employers pay employees all wages, which is defined as "any compensation owed an employee by an employer pursuant to an employment contract." 820 ILCS 115/2. Defendants argue that by providing plaintiffs with a letter warning them of the reduced rate in wages, they notified plaintiffs and complied with the IWPCA. Defendants note that the IWPCA instructs employers to "notify employees of any changes in the arrangements [of the

10

rate of pay] prior to the time of change." 820 ILSC 115/10. Further, Illinois law allows employers to unilaterally modify compensation. *Geary v. Telular Corp.*, 341 Ill. App. 3d 694, 651, 793 N.E.2d 128, 131 (1st Dist. 2003).

Yata claims that he never received the letter and that the letter itself is not authenticated. Yata points out that there is no affidavit authenticating the letter and that defendants did not testify that they sent the letter to Yata. The authentication requirement is minimal, Yata's authentication argument is cursory, Yata did not challenge the authentication of the letter in the TLA arguments, and Yata did not raise the authentication issue in its opening brief. The Court will thus consider the letter for purposes of this motion. The letter shows a genuine issue of material fact exists as to whether defendants legally changed Yata's rate per mile.

Finally, named plaintiffs fail to argue how the one-time processing fees or Zukancic's logbook fee violates the IWPCA. Zukancic's service agreement states "the first log violation you get will result in a fine of $250." (Dkt. 110-5, Exhibit 4 to Jasmin Zukancic Deposition, pg. 2.) The Court denies summary judgment on these alleged violations of the IWPCA.

*Defendant Mujkic's Personal Liability*

The parties dispute whether defendant Mujkic can be held personally liable for defendant BDJ's IWPCA violations. Under the IWPCA, officers of corporations that knowingly permit IWPCA violations are liable as employers. As BDJ's President, defendant Mujkic knowingly allowed BDJ to violate the IWPCA. (*See generally* Dkt. 94-4, Senad Mujkic Deposition Transcript.) Mujkic is thus personally liable for the escrow deductions that the Court has granted summary judgment for the plaintiffs.

## IV. CONCLUSION

The Court GRANTS in part and DENIES in part plaintiffs' motion for summary judgment [92]. The Court DENIES defendants' motion for summary judgment [95]. Given the overlap

between the claims and that some claims will continue to be litigated, the Court will address

damages later in the proceedings.  IT IS SO ORDERED.

Date: May 3, 2021

Entered: _____

SHARON JOHNSON COLEMAN
United States District Judge